# COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No.   30815-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | ORDER GRANTING MOTION |
| | ) | TO PUBLISH OPINION IN PART |
| NATHEN LEE BENNETT, | ) | |
| | ) | |
| Appellant. | ) | |

THE COURT has considered the respondent's motion to publish the court's

opinion of February 18, 2014, and the record and file herein, and is of the opinion the

motion should be granted in part.  Therefore,

IT IS ORDERED, the motion to publish is granted in part.  The opinion filed by

the court on February 18, 2014, shall be modified as follows:

(1)     On page 1 to designate it is an opinion published in part.

(2)     After the first sentence on page 9 add the following language:

> Affirmed.
> The remainder of this opinion has no precedential
> value.  Therefore, it will be filed for public record in
> accordance with the rules governing unpublished opinions
> RCW 2.06.040.

No. 30815-4-III
*State v. Bennett*

(3)     On page 11 by deletion of the following language:

A majority of the panel has determined that this
opinion will not be printed in the Washington Appellate
Reports but it will be filed for public record pursuant to RCW
2.06.040.

DATED: April 22, 2014

PANEL: Judges Siddoway, Brown, Korsmo

FOR THE COURT:

_____
LAUREL H. SIDDOWAY, Chief Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30815-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATHEN LEE BENNETT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

KORSMO, C.J. — Nathen Bennett's appeal challenges the trial court's denial of two of his peremptory challenges on *Batson*[1] grounds and the refusal to allow a self-defense instruction. We affirm his conviction for second degree felony murder.

FACTS

The relevant procedural and historical facts of this case are not in dispute. Mr. Bennett, then 19, stabbed 48 year old Leonard Cantu 26 times in the neck, chest, back, fingers, and arms, killing him. Mr. Bennett told investigators that the older man was performing oral sex on him against his will. The two men had had a sexual encounter the evening before the fatal encounter.

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

No. 30815-4-III
*State v. Bennett*

The matter proceeded to jury trial in the Yakima County Superior Court. During jury selection, defense counsel exercised all six peremptory challenges; four of those challenges were used against Hispanic[2] jurors. The prosecutor objected on *Batson* grounds, arguing that the four strikes were racially motivated since they removed the only Hispanic members of the venire who were high enough in the draw to serve on the panel. The prosecutor noted that Mr. Cantu was Hispanic while Mr. Bennett was Caucasian.

Defense counsel denied that the four challenged strikes were racially motivated or that a prima facie case of discrimination had been established. The trial court directed defense counsel to explain his reasons for striking the four jurors. Counsel explained that juror 4, a mother of several young children, did not appear interested in the proceedings. Juror 10 was a United States probation officer. Juror 21 was stricken because he was a teacher who gave religious testimonials and volunteered at the Union Gospel Mission. Juror 31 was challenged because his work schedule at a warehouse might interfere with the trial.

The challenges came at the end of the first day of trial and the court directed all jurors to return the next day. The next morning the court found that defense counsel had presented valid reasons for striking jurors 10 and 31, but determined that juror 4 and juror 21 were stricken because of their race. Because the delay in jury selection suggested that

---

[2] The parties use the term "Hispanic" instead of "Latino," and we will follow their approach in this opinion.

2

the trial would not end as early as the jurors had originally been told, the court reopened voir dire for the purpose of determining if the lengthier trial period would create any hardships. Juror 31 was excused for cause when he indicated that the trial would create hardship for him at work.

The parties then exercised their peremptory challenges anew. The defense was given the opportunity to explain additional reasons for striking jurors 4 and 21, but had no additional reasons to articulate for the court. The defense again used all six peremptory challenges—three against juror 10 and the other two jurors it had attempted to strike the day before, and three against additional members of the venire. The prosecutor, who had stricken six the previous day, struck only three members of the venire.

Trial commenced. Mr. Bennett took the stand in his own behalf and described his encounters with Mr. Cantu. He told jurors that he acted in self-defense because he feared that he would be raped if he did not act. After hearing argument, the court declined to instruct the jury on self-defense, reasoning that deadly force was not appropriate because there was no evidence Mr. Bennett feared imminent bodily harm and that stabbing the victim 26 times was not necessary.

The jury, with juror 21 serving as foreperson, convicted Mr. Bennett as charged. The trial court imposed a standard range sentence. Mr. Bennett then timely appealed to this court.

## ANALYSIS

This appeal challenges the court's denial of two defense peremptory challenges and the refusal to instruct on self-defense. We address first the *Batson* claim and then the instructional argument.

*Batson*

Mr. Bennett strenuously argues that the trial court erred in not accepting his race-neutral explanations for challenging jurors 4 and 21. However, it is not the province of an appellate court to overturn what is primarily a factual determination—a party's motive for removing a member of the venire.

In *Batson v. Kentucky*, 476 U.S. 79, 83, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the United States Supreme Court faced a situation where the prosecutor had used peremptory challenges to remove all four black jurors from the venire. The court concluded that the practice of removing all minority jurors violated both the defendant's and the jurors' right to equal protection of the law. *Id.* at 86-87. The court then set forth a three part test for evaluating allegations of discrimination in jury selection: (1) the defendant must make a prima facie showing of discriminatory action; (2) upon finding a prima facie case, the court must require the prosecutor to provide any race-neutral explanation for the challenges; and (3) the court must then determine in light of the proffered explanation if the defendant has made a showing of purposeful discrimination. *Id.* at 96-98.

4

This new limitation on the use of peremptory challenges resulted in an explosion of litigation and eventual refinement of the *Batson* rule. Over time the original *Batson* standard was modified in recognition that it was the *juror's* rights, rather than those of a party, that were being violated by discriminatory peremptory challenges. *Powers v. Ohio*, 499 U.S. 400, 409, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). That ruling then led to the recognition that either party to litigation had the standing to challenge the alleged violation of the juror's rights and that *Batson*'s rule also applied in civil cases. *Id.* at 415; *Georgia v. McCollum*, 505 U.S. 42, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992) (State could challenge criminal defendant's discriminatory peremptory challenges); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991) (discriminatory peremptory challenges in civil litigation). Subsequently, the freedom from discriminatory exercise of peremptory challenges was expanded to include gender in addition to race. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). What began in *Batson* as recognition that a minority criminal defendant should not have members of his race excluded from jury service evolved into recognition that all jurors have the right to be free from race or gender discrimination in jury selection.

Washington's experience on these issues has mirrored the federal experience, with early cases addressing similar issues. *E.g.*, *State v. Vreen*, 143 Wn.2d 923, 26 P.3d 236 (2001) (prosecutor challenging defendant's peremptory challenge); *State v. Evans*, 100 Wn. App. 757, 998 P.2d 373 (2000) (judge may raise *Batson* issue sua sponte, but must follow

5

three prong test); *State v. Burch*, 65 Wn. App. 828, 830 P.2d 357 (1992) (gender discrimination). Recent cases have addressed whether or not a prima facie case of discrimination was established or whether the race-neutral explanation accepted by the trial court was borne out in the record of the case. *E.g.*, *State v. Saintcalle*, 178 Wn.2d 34, 309 P.3d 326 (2013) (prima facie case), *cert. denied*, 134 S. Ct. 831 (2013); *State v. Hicks*, 163 Wn.2d 477, 181 P.3d 831 (2008) (sufficiency of explanation).

As with other recent cases, this case turns on the trial court's assessment of the three part *Batson* test. However, this case raises the rarer issue of an appellant challenging the trial judge's refusal to accept his stated reasons for exercising the peremptory challenge. Our case law does clearly address the situation.

*Batson* itself noted that the existence of discrimination is a factual finding and, thus, "will turn on evaluation of credibility," requiring the reviewing court to "give those findings great deference." 476 U.S. at 98 n.21; *Accord, Hicks*, 163 Wn.2d at 493; *Evans*, 100 Wn. App. at 764. This standard also applies to the trial court's decision on whether the race-neutral explanations are credible. *Miller-El v. Cockrell*, 537 U.S. 322, 339, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003). When a trial court accepts the proffered explanation for exercising a peremptory challenge, "we fail to see how the appellate court nevertheless could find discrimination." *Hernandez v. New York*, 500 U.S. 352, 367, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). This is because the credibility determination concerning the explanation "goes to the heart of the equal protection analysis, and once that has been

6

settled, there seems nothing left to review." *Id.* This standard is consistent with Washington appellate review standards. Our appellate courts do not weigh evidence and do not find facts. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 575, 343 P.2d 183 (1959); *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009). We similarly do not substitute our judgment for that of the trier of fact. *Hesperian*, 54 Wn.2d at 575. Whether the facts are as the parties allege is for the trial judge to determine, not this court. *Id.*

Mr. Bennett argues strenuously that he did provide race-neutral reasons for his remaining challenges and the trial court erred in concluding otherwise. His arguments, however, run up against a solid wall of federal and state appellate deference to this type of fact finding. Although we agree that his proffered explanations appear race-neutral and would have supported a conclusion that they were race-neutral, we cannot overturn the trial court's contrary evaluation. *Hernandez*, 500 U.S. at 367. As we once described our role in a different setting, an appellate court simply is not in a position to find persuasive that evidence which the trier of fact found to be unpersuasive. *Quinn*, 153 Wn. App. at 717. We must defer here to the trial judge's contrary factual determinations. The trial judge, not this court, had the opportunity to observe counsel, hear his explanation, and consider it in the context of this case and other cases counsel has presented over the years.

Trial counsel took personal offense, understandably, at the trial judge's ruling. There should be few things more odious in these times than to be judicially labeled as racist or

7

discriminatory. For a lawyer, it also constitutes professional misconduct. RPC 8.4(g), (h).[3] An attorney is unlikely to casually make an allegation of discriminatory conduct against another member of the bar, and we are convinced that trial judges likewise proceed cautiously with such accusations. Racial discrimination remains a problem in our society and, although we like to hope lawyers will not act on such a basis in the performance of their duties, we likewise cannot turn our heads from or disavow a trial judge's ruling that counsel did act in a discriminatory manner. *Batson* is a blunt tool for dealing with a continuing problem that is more subtly expressed than in days of old. We share the concerns expressed in several of the opinions filed in *Saintcalle* concerning the efficacy of *Batson*.

Here the record supports the trial judge. The defense excused the only Hispanic jurors in the portion of the jury pool who had a mathematical chance of serving.[4] Given that this crime involved a defendant and victim of different races, we agree that the exclusion of all the jurors of the same race as the victim provided strong support for the trial judge's conclusion that the challenges were discriminatory.

---

[3] RPC 8.4 provides in part, that, "It is professional misconduct for a lawyer to . . . (g) commit a discriminatory act prohibited by state law on the basis of sex, race, . . . ; (h) in representing a client, engage in conduct that is prejudicial to the administration of justice toward . . . jurors . . . that a reasonable person would interpret as manifesting prejudice or bias on the basis of . . . race."

[4] This evidence, of course, is ambiguous because a trial attorney is unlikely to waste a challenge on someone who cannot rise to the top of the jury list.

8

The trial court did not err in sustaining the *Batson* challenge to the two jurors.

*Self-Defense*

Mr. Bennett also argues that the court erred in denying his request for a self-defense instruction. We agree with the trial court that the instruction was not available under the facts of this case.

Under our statutes, self-defense is available when, inter alia, it is needed "by a party about to be injured, or . . . in preventing or attempting to prevent an offense against his or her person." RCW 9A.16.020(3). In addition, homicide is justified only "when committed in the actual resistance of an attempt to commit a felony upon the slayer." RCW 9A.16.050(2) (partial). The statutory scheme also dictates that an action is "necessary" when "no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended." RCW 9A.16.010(1).

The decision to decline to instruct on self-defense is reviewed for abuse of discretion when it is based on factual reasons, but is reviewed de novo if based on a legal reason. *State v. Brightman*, 155 Wn.2d 506, 519, 122 P.3d 150 (2005). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Both standards are implicated here.

9

As the trial court correctly concluded, the analysis in *Brightman* governs this case. There the defendant testified that he accidentally killed the victim by striking him with a gun while resisting a robbery. 155 Wn.2d at 510. In reviewing RCW 9A.16.050(2), the court concluded that deadly force was only justified when it was necessary. *Brightman*, 155 Wn.2d at 521. Older case authority construing the statute likewise had concluded that even when a serious felony such as robbery was in progress, use of deadly force to repel the offense was not justified unless the defendant was threatened with death or great bodily injury. *Id.* at 522. The trial court could conclude as a matter of law that deadly force was not necessary under the facts of *Brightman*. *Id.* at 523-24.

The trial court concluded here that Mr. Bennett was in the same position as the defendant in *Brightman*. We agree. While rape is a crime that can be resisted with deadly force, that degree of force was unnecessary under these facts because the defendant did not show that he was in danger of great bodily injury. Mr. Cantu was not armed with any weapon nor had he threatened to inflict great bodily injury on Mr. Bennett. While Mr. Bennett was entitled to use force to repel the unwanted sexual contact, he was not entitled to kill Mr. Cantu. He also did not present an evidentiary basis for justifying why he needed to stab Mr. Cantu 26 times. There was no indication that Mr. Cantu persisted in attempting sexual contact after he was first stabbed or that he threatened additional harm to Mr. Bennett from that point. Even if one or two stab

10

No. 30815-4-III
*State v. Bennett*

wounds could be justified (or at least present a jury question), 26 such wounds could not be justified.

For both reasons—there was no showing of a need for using deadly force and there was no showing that 26 stabs were necessary to repel the assault—the trial court did not err in denying the self-defense instructions.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Korsmo, C.J.

WE CONCUR:

Brown, J.

Siddoway, J.

11