

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37987-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JOSE CARLOS QUIROGA LEDESMA, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Jose Carlos Quiroga Ledesma appeals his three first degree child molestation convictions. We conclude there was no reversible error and affirm.

## FACTS

N.B.[1] and her family moved from Florida to Washington in September 2017. In February 2018, N.B.'s family joined a church where they met Jose Carlos Quiroga Ledesma and his family. N.B. went to Bible study on Tuesdays and regular church services on Fridays and Sundays. N.B. became good friends with Ledesma's daughter,

---

[1] To protect the privacy interests of the child victim, we use her initials throughout this opinion. Gen. Order 2012-1 of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses*, (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2012_001&div=III.

K.Q., and their families became very close.  N.B. spent a lot of time with K.Q. at her home and referred to Ledesma as "Tio," a Spanish term for family member.  3 Report of Proceedings (RP) (Aug. 20, 2019) at 353.

In August 2018, N.B. told her youth ministry pastor, Yessica Marenco, that Ledesma had been touching her.  The topic came up after a pastor gave a sermon discussing abuse.  While Ms. Marenco drove N.B. and K.Q. home from the sermon, N.B. said she thought she was being abused.  She was very nervous.  Later in the evening, N.B. told Ms. Marenco more details.  The next morning, Ms. Marenco told church leaders, who told N.B.'s mother and later notified the police.  N.B.'s mother took her to the hospital when she found out about the abuse.  N.B. eventually told her mother what happened herself.

The State charged Ledesma with three counts of child molestation in the first degree based on allegations of abuse between May 1 and August 18, 2018.  Counts 2 and 3 accused Ledesma of the molestation "and/or a crime based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan, and/or so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the others . . . ."  Clerk's Papers (CP) at 3-4.

*Trial*

      *State's witnesses*

The State called N.B., N.B.'s mother, Ms. Marenco, K.Q., the church pastor, and a

Tacoma Police Department detective assigned to the case.

      *N.B.*

N.B. was 11 years old when Ledesma touched her inappropriately several times.

The first incident happened when she and her parents were at Ledesma's apartment with a

few other people.  Everyone was eating outside on the patio.  N.B. asked Ledesma's wife

for a jacket and went inside to get it from a closet.  She got hot later and, when she went

to put the jacket back, she said:  "I was having a difficult time putting it back and I asked

for help, and then that's when [Ledesma] put his hands in my pocket."  3 RP (Aug. 20,

2019) at 356.  She told him to "'please help me put the jacket back,'" but he would not.

3 RP (Aug. 20, 2019) at 358.  His hands were in her front pants pockets, and she thought

"[h]e was trying to touch my private area."  3 RP (Aug. 20, 2019) at 359.  His fingers

were on her thigh and could not reach her vagina but were close.  N.B. was

uncomfortable but she did not say anything to anyone.  After the jacket was on the

hanger, N.B. went back to spend time with K.Q.  N.B. and her parents left a few minutes

later.

The next incident happened when N.B. and K.Q. were sleeping on Ledesma's living room floor. She testified, "I couldn't go to sleep, and then when I was able to sleep, he woke me up. It was around 3:00 in the morning and he pulled my shirt to wake [me] up." 3 RP (Aug. 20, 2019) at 367. She "got up thinking something was wrong," and then Ledesma started touching her. 3 RP (Aug. 20, 2019) at 369. He grabbed her by her back, put his arms around her, and started kissing her with his tongue in her mouth. He touched her buttocks over her clothes while their bodies were touching. He also put her hand on his erect penis over his clothes. After she moved her hand, he went back to his room. K.Q. did not wake up, and N.B. did not tell her because she did not want to be a "snitch" or break up their friendship. 3 RP (Aug. 20, 2019) at 379.

N.B. could not fall back asleep afterward. Around 6:00 a.m., Ledesma gestured to her to come to the hallway. He touched N.B.'s buttocks, put his tongue in her mouth, and told her he wanted to sleep with her. N.B. answered, "'No,'" and walked back to the couch. 3 RP (Aug. 20, 2019) at 382. K.Q. woke up when N.B. got back to the couch.

The next incident happened when Ledesma drove N.B. and K.Q. home from a friend's house after a sleepover. Ledesma's truck had a lot of stuff in the back seat, so K.Q. told N.B. to sit in the front where there was more space. During the ride, Ledesma grabbed N.B.'s left thigh, over her pants, with his right hand. She felt uncomfortable and

crossed her legs. He put his hand back on her thigh and touched her vagina before she

moved his hand. He tried again and when she moved his hand, he squeezed her hand

forcefully. He told her to pull her sleeves up because it was "'too hot,'" and pushed

them up with his hand. 3 RP (Aug. 20, 2019) at 394. Then he told K.Q. to look for

something in the back, and he pretended to look for something in the passenger door and

reached over and touched N.B.'s breast for a couple seconds. On cross-examination,

N.B. said that she and K.Q. had been talking throughout the whole car ride.

When N.B., K.Q., and Ledesma arrived home from the truck ride, K.Q. and her

mother went to choose outfits in the bedroom and left N.B. in the living room. Ledesma

called to N.B. from the kitchen, and he "kind of like cornered [her] where the table was."

3 RP (Aug. 20, 2019) at 395. She said, "I backed away and then he grabbed me by my

waist and pulled me toward him. He tried to kiss me, but I kept moving away and moving

away. And then [K.Q.] came out, and then I moved." 3 RP (Aug. 20, 2019) at 395.

The final incident occurred a few days later at the church Ledesma and N.B.

attended. There are two Sunday services and church members eat lunch together in the

downstairs area between services. At lunch time, Ledesma told N.B. to go to the back of

the church, where there is an alleyway. N.B. was not eating with everyone. N.B.'s

mother tried to get her to eat, and Ledesma offered to drive her to get food. She said

5

"'no'" to both. 3 RP (Aug. 20, 2019) at 404. She went outside because she thought

Ledesma would tell her that "this was going to stop" or "that he was sorry." 3 RP

(Aug. 20, 2019) at 404. When she walked to the back of the church, Ledesma was

already in the alley. She said he "grabbed me and he tried to kiss me but I faced away."

3 RP (Aug. 20, 2019) at 402. He kissed her cheek because she moved her face. She told

him to stop and he kept trying to grab her. Then, a "girl popped up in the window" facing

the alleyway and the girl said "Hey." 3 RP (Aug. 20, 2019) at 409. N.B. said hello and

walked away.

On cross-examination, N.B. testified that she wants to move back to Florida. She

knew her parents were still friends with Ledesma and his wife, but she was not friends

with K.Q. anymore. She was not aware that their parents had planned a winter vacation

for their families.

### Cristina Arreche

N.B.'s mother, Cristina Arreche, described how her family became close with

Ledesma's family when they moved to Washington. She did not recall the night when

N.B. asked for a jacket and only knew what N.B. said about it.

After learning of the accusations and talking with police, Ms. Arreche continued

seeing Ledesma and his wife, but infrequently. She loved Ledesma's wife very much and

tried to forgive Ledesma. Ledesma told her "he didn't know why he had done it."

3 RP (Aug. 20, 2019) at 466. Ms. Arreche forgave him because, "If I want God to

forgive me, I also have to forgive." 3 RP (Aug. 20, 2019) at 478. The families no longer

have contact.

### K.Q.

K.Q. testified that she never saw her father with N.B. near the closet. She

remembers a night when her mother grabbed a jacket from the closet and gave it to Ms.

Arreche. Ms. Arreche then gave it to N.B., who took it home with her when her family

left.

N.B. spent the night in K.Q.'s living room one time. K.Q. did not recall seeing

N.B. on her phone on the couch in the early morning and she did not see Ledesma come

into the room. K.Q. is a light sleeper and wakes up when her parents go to the bathroom

and when her pet birds chirp.

K.Q. remembered when Ledesma picked her and N.B. up from a sleepover. She

sat in the back seat of Ledesma's truck because she is smaller and fit better. K.Q. did not

fall asleep during the ride and could see and talk to N.B. the whole time. She did not see

Ledesma touch N.B., try to roll up her sleeves, lean across her to get something out of the

door, or do anything unusual.  She could not remember what happened after the truck ride.

When N.B. told K.Q. and Ms. Marenco about the abuse, K.Q. was angry and sad because she was "losing a friend right there."  4 RP (Aug. 21-22, 2019) at 535.  K.Q. "knew [N.B.] was lying and she didn't understand at the time."  4 RP (Aug. 21-22, 2019) at 536.

### *Dr. Kallas*

Dr. Robin Kallas, an emergency pediatric medicine physician, treated N.B. upon her arrival at the hospital.  She described the hospital's protocol for patients who allege sexual assault:

> Typically, the physician will present, speak to the parent, medically clear the patient.  And then if there's no emergent medical condition, we will have the social worker go speak with the family.  And once the social worker is complete, we'll go back in and complete the physical exam.

4 RP (Aug. 21-22, 2019) at 587.  The following exchange took place:

> [THE STATE:]  . . . Prior to the examination, what kinds of information do you need, as a physician, in order to figure out what kind of examination you're going to do?
> [DR. KALLAS:]  I'll speak with the social worker.  She will tell me the circumstances of the concern.  Typically, if it's a teenager and we expect physical findings, there is a [SANE[2]] nurse that will come in and assist with the exam.

---

[2] Sexual assault nurse examiner.

. . . .

[THE STATE:]  Okay.  And you said that person gets summoned if you expect physical findings?

[DR. KALLAS:]  Yes.

[THE STATE:]  What kinds of criteria or information do you use when making that determination?

[DR. KALLAS:]  If the family members have told the social worker that there was recent penetration or sexual activ[ity] or unexpected rape.

[THE STATE:]  That's penetration of the vagina or anus?

[DR. KALLAS:]  Right.  And if it's been within three days, is when we will typically collect evidence.

[THE STATE:]  Okay.  Why is your protocol such that you don't speak with the patient yourself?

[DR. KALLAS:]  We don't want to influence anything that they have to say. . . .

[THE STATE:]  Okay.  So the social worker speaks with the parent, usually, or the child?

[DR. KALLAS:]  Usually the social worker will speak with the parent.

4 RP (Aug. 21-22, 2019) at 589-90.

The prosecutor then asked, "[W]hat information did you have prior to your examination that was relevant to your examination?"  4 RP (Aug. 21-22, 2019) at 591.

The court overruled Ledesma's objection.  Dr. Kallas answered: "I was told by the social worker that the event had occurred more than three days prior.  I was told that there was alleged fondling over clothing."  4 RP (Aug. 21-22, 2019) at 592.  Based on that information, Dr. Kallas did not call the SANE nurse and conducted the exam herself.

9

After completing a full exam of N.B., including her genitals, she determined N.B. was

healthy.

The court sent out the jury and the defense explained its objection to Dr. Kallas's

testimony regarding what the social worker told her:

> [T]his witness is testifying to statements that were made either by [N.B.] or
> by her mother. This witness doesn't know. So it's a double hearsay
> statement. The information that this witness was testifying to came from
> the social worker. That's one level of hearsay. Then there's a second level
> of hearsay, either from [N.B.] or from her mother in giving that information
> about what sexual assault might have occurred there. That's why I think
> it's objectionable. And the foundation was not laid to overcome that
> objection.
>
> Secondly, is that because the witness testified that she was following
> protocols that were done in connection with the police and the prosecutor's
> office, it is clearly to collect—to preserve testimonial evidence, which
> means that it does not meet the standard necessary for a medical records
> exception because this information was not necessarily given to the social
> worker for the purposes of the exam, but for many purposes, including law
> enforcement purposes. And the doctor specifically avoids taking that
> information, which probably would meet the hearsay exception for that,
> because of the procedures that have been set up in conjunction with law
> enforcement. So I don't think that was appropriate to come in.

4 RP (Aug. 21-22, 2019) at 597-98. The court disagreed:

> I think it was for medical diagnosis and for her—she testified about—it was
> obviously very vague, she didn't say anything specific about what [N.B.]
> said, just what the general nature of the allegations were. And if that was
> prejudicial in any way, I don't believe it was. I think it's probative and it is
> through the medical exception to hearsay that she needed it in order to
> determine what she was going to do next, in terms of her exam.

4 RP (Aug. 21-22, 2019) at 598.

*Defense witnesses*

The defense called Ledesma's wife and two family friends who had been present during the jacket incident.

*Judith Saavedra*

Judith Saavedra, Ledesma's wife, confirmed that she was close with N.B.'s family. She remembered the night of the alleged jacket incident: they were having coffee at the dining room table with N.B.'s parents and another couple. When N.B. and her parents were getting ready to leave, it had gotten cold outside so Ms. Saavedra retrieved a jacket from the closet and lent it to N.B.'s mother. Ms. Arreche said it was best if N.B. wore the jacket, so N.B. put it on, and they left. N.B. did not get the jacket out of the closet nor did she put the jacket back. Ledesma was in the dining room the whole time, and Ms. Saavedra did not see Ledesma touch N.B.

N.B. spent the night at Ms. Saavedra's home twice. The second time, N.B. and K.Q. slept in the living room. Ms. Saavedra went to bed around 12:30 a.m. that night, and Ledesma was already asleep. She did not hear anything unusual.

Ms. Saavedra remembered the day of the alleged church incident because she went outside to get heartburn medication from her car. Ledesma was picking up garbage

11

outside, which he did every other Sunday between services. She saw N.B. walking nearby, talking on her cell phone. N.B. and Ledesma were not interacting. Ledesma and Ms. Saavedra went back inside together after she got the medication from her car.

Even after the allegations, N.B.'s parents socialized with Ms. Saavedra and Ledesma. On one occasion, N.B. was in Ms. Saavedra and Ledesma's home and was not acting uncomfortable. In November, after the allegations, N.B.'s mother invited K.Q., Ms. Saavedra, and Ledesma to go on a trip, but they did not go. The families are no longer friends.

### *Beatriz Hernandez and Cergio Hinojosa*

Beatriz Hernandez was at Ledesma's house on the night of the jacket incident. She saw Ms. Arreche give the jacket to N.B., who put it on before they all left. She could not recall whether Ms. Arreche asked for the jacket or if Ms. Saavedra offered it. She did not see Ledesma near N.B. nor did she see N.B. try to put the jacket away. She had known Ledesma and Ms. Saavedra for 15 years, and they never had coffee or dinner on the patio.

Cergio Hinojosa, Ms. Hernandez's husband, testified similarly. On the night of the jacket incident, he saw Ms. Arreche give the jacket to N.B. before they left.

*Ledesma*

Outside the presence of the jury, the court asked the defense to make a record on

Ledesma's decision not to testify.  The following exchange took place:

> [THE DEFENSE]:  . . . Your Honor, I've discussed it thoroughly
> with my client.  I've advised him that he has an absolute right to testify and
> that he does not have to testify, either.  I read him the Jury Instruction that
> will be given in light of him not testifying, and so he understands that the
> jury cannot draw any conclusions from that, and he's made a decision not to
> testify in this case.
> THE COURT:  Is what [defense counsel] just told me, is that all
> true?
> [LEDESMA]:  Yes.
> THE COURT:  You had an opportunity to talk to him about your
> Constitutional right to testify?
> [LEDESMA]:  Yes.
> THE COURT:  And your absolute right not to testify?
> [LEDESMA]:  Yes.
> THE COURT:  And what is your decision about that?
> [LEDESMA]:  Not to testify.
> THE COURT:  Okay. Thank you.

5 RP (Aug. 26-27, 2019) at 679-80.

The defense rested and the State did not call any rebuttal witnesses.

No. 37987-6-III
*State v. Ledesma*

*Petrich*[3] *instruction, closing arguments, and verdict*

The trial court gave instructions of law to the jury, including a *Petrich* instruction,

which provided:

> The State alleges that the defendant committed multiple acts of child molestation in the first degree on multiple occasions.  To convict the defendant on any count of child molestation in the first degree, one particular act of child molestation in the first degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved.  You need not unanimously agree that the defendant committed all the acts of child molestation in the first degree.

CP at 60.

In closing, the State elaborated on the *Petrich* instruction:

> [N.B.] testified about four different incidents where the defendant touched her inappropriately.  Each incident involved one or more types of sexual contact.
>
> . . . [A]ny of these incidents may be considered as an incident that you can convict . . . on, but it has to be agreed by the 12 of you.
>
> For example, all 12 of you have to agree that he kissed her on the mouth with his tongue.  And so you can assign that to Count I.  Count II has to be a different act, but all 12 of you must decide on that particular act.
>
> So with regard to the act of him putting her hand on his penis, that can be No. 2, if you all agree to that being No. 2.  It has to be different than the other counts and so on.

---

[3] *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), *overruled in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 406 n.1, 756 P.2d 105 (1988), *abrogated in part on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014).

5 RP (August 26-27, 2019) at 685-86. The State recounted the jacket, sleepover, truck, and church incidents, emphasizing how Ledesma came back after the first sleepover incident to do the same thing again. He discussed how the truck incident started with Ledesma's hand on N.B.'s thigh but later ended up with his hand on her breast.

During deliberations, the jury sent out the following question: "Can multiple counts arise from [the] same incident?" CP at 67. The court answered, "Please reread the jury instructions." CP at 67.

The jury found Ledesma guilty on all three counts of first degree child molestation. The court imposed a concurrent sentence of 130 months to life for each count, based on an offender score of 6.

Ledesma appeals.

## ANALYSIS

INEFFECTIVE ASSISTANCE OF COUNSEL

Ledesma contends his counsel was ineffective for two reasons. First, his counsel failed to make a half-time motion that there was insufficient evidence regarding the jacket, kitchen, and church incidents to convict. Second, his counsel failed to argue same criminal conduct regarding the truck and sleepover incidents at sentencing.

We first set forth the applicable standards.  Both the federal and state constitutions guarantee the right to effective assistance of counsel.  *See* U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.  We review claims of ineffective assistance of counsel de novo.  *State v. Jones*, 183 Wn.2d 327, 338-39, 352 P.3d 776 (2015).

To prevail on an ineffective assistance of counsel claim, a defendant must show both (1) deficient performance and (2) resulting prejudice.  *State v. Estes*, 188 Wn.2d 450, 457-58, 395 P.3d 1045 (2017) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).  Performance is deficient when it falls "below an objective standard of reasonableness based on consideration of all the circumstances . . . ."  *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).  The threshold for deficiency is high; a defendant must overcome a strong presumption that counsel's performance was effective.  *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).  Prejudice results when, within reasonable probabilities, the outcome of the proceedings would have differed but for counsel's deficient performance.  *Estes*, 188 Wn.2d at 458.  A defendant must show more than a "'conceivable effect on the outcome'" to prevail.  *Id.* (internal quotation marks omitted) (quoting *State v. Crawford*, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006)).

### 1. *Half-time motion*

Ledesma contends his counsel was ineffective for failing to bring a half-time motion to dismiss for insufficient evidence that sexual contact occurred during the jacket, truck, and church incidents. We disagree.

When reviewing a claim of insufficiency, we view the evidence and reasonable inferences drawn therein in the light most favorable to the State. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We then ask whether any rational trier of fact could have found the State proved the elements of the crime beyond a reasonable doubt. *Id.* The weight and credibility of the evidence is left to the trier of fact and cannot be reviewed on appeal. *State v. Goodman*, 150 Wn.2d 774, 781, 783, 83 P.3d 410 (2004). We review the sufficiency of the evidence de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014).

To convict Ledesma of child molestation in the first degree, the State had to prove that: (1) Ledesma had sexual contact with a N.B., (2) N.B. was less than 12 years old at the time of the contact and was not married to Ledesma, (3) N.B. is at least 36 months younger than Ledesma, and (4) this contact occurred in Washington. *See* RCW 9A.44.083.

Ledesma argues the State failed to prove sexual contact. "Sexual contact" means "any touching of the sexual or intimate parts of a person done for the purpose of gratifying sexual desire of either party." RCW 9A.44.010(2). Contact is sexual "if the conduct is of such a nature that a person of common intelligence could fairly be expected to know that, under the circumstances, the parts touched were intimate and therefore the touching was improper." *State v. Jackson*, 145 Wn. App. 814, 819, 187 P.3d 321 (2008). The statute protects "parts of the body in close proximity to the primary erogenous areas which a reasonable person could deem private with respect to salacious touching by another." *In re Welfare of Adams*, 24 Wn. App. 517, 521, 601 P.2d 995 (1979).

Whether contact is sexual may be determined as a matter of law when it involves direct contact to the genitals or breasts. *Id.* at 520. Conversely, whether contact with other body parts is sexual must be left to the trier of fact. *Jackson*, 145 Wn. App. at 819. Even over-the-clothing touching may be sexual contact if it is not susceptible of an innocent explanation. *State v. Harstad*, 153 Wn. App. 10, 22, 218 P.3d 624 (2009).

Ledesma first claims the jacket incident, when he put his hands in N.B.'s pants pockets, did not constitute sexual contact. He next claims the kitchen and church incidents, when he grabbed N.B. by her waist, pulled her toward him, and tried to kiss her, were not sexual contact. He relies on *State v. R.P.*, 67 Wn. App. 663, 838 P.2d 701

18

(1992), *aff'd in part, rev'd in part*, 122 Wn.2d 735, 862 P.2d 127 (1993), and *State v. Marcum*, 61 Wn. App. 611, 811 P.2d 963 (1991), to support his position.

In *R.P.*, the defendant picked up, hugged, and kissed a classmate before placing a "'hickey'" on her neck.  67 Wn. App. at 665.  R.P. appealed his indecent liberties conviction, arguing insufficient evidence of sexual contact.  Division One of this court affirmed: R.P. forcibly contacted the victim's neck with his lips, which are associated with sexually intimate acts, and the contact lasted long enough to bruise.  *Id.* at 669.

The Supreme Court reversed on that count.  Its two-paragraph opinion read, in part: "After examining the record and the facts of this case, we find that there was insufficient evidence of sexual contact to sustain count 1 (indecent liberties)." *R.P.*, 122 Wn.2d at 736.

In *Marcum*, the defendant argued the evidence that he put his hands down the inside of the victim's pants (count 2) and kissed the victim's face and rubbed his chest (count 3) was insufficient to prove first degree child molestation.  61 Wn. App. at 612 n.1.  In a footnote, Division Two held that evidence of the defendant's hands in the victim's pants was "enough to raise an inference that he did so for sexual gratification." *Id.*  Without explanation, it reversed on count 3, holding that evidence of kissing and chest rubbing were insufficient to convict.  *Id.*

19

Neither of these cases contain sufficient facts on the circumstances of the contact nor do they provide analysis as to why the contact was not sexual. We find *Adams* is more helpful to our analysis, where the court held the defendant's contact with the victim's hips was sexual because, under the circumstances, the touching was improper. 24 Wn. App. at 520. The *Adams* court explained that a jury can determine whether conduct is improper using "commonly accepted community sense of decency, propriety and morality." *Id.*

Here, the jury determined Ledesma's contact with N.B. was sexual. Because Ledesma touched N.B. over her clothes on her thighs and waist, and not her genitals or breasts, the nature of the contact was a question for the jury. The State's evidence, which we take as true, sufficiently supports the jury's finding. Ledesma offered no innocent explanation for the challenged incidents—putting his hands deep inside an 11-year-old girl's front pockets, later cornering the same girl and trying to kiss her, and still later trying to kiss her on the lips while she resisted. These incidents are all improper according to a commonly accepted community sense of decency and morality, and any reasonable person in Ledesma's situation should have known as much. The evidence sufficiently supported a finding of sexual contact for all three challenged incidents.

Because the evidence was sufficient to prove sexual contact, Ledesma's counsel was not ineffective for not moving to dismiss on those grounds. A reasonable attorney would not make a failing motion; thus, the performance did not fall below an objective standard of reasonableness.

### 2. *Not arguing same criminal conduct at sentencing*

Ledesma next contends his counsel was ineffective for failing to argue at sentencing that the two molestations during the sleepover and the two molestations during the truck ride were the same criminal conduct. We agree that it was deficient performance not to make the argument, but we conclude that Ledesma has not shown his sentence would have differed had counsel done so.

Failure to argue same criminal conduct at sentencing may constitute ineffective assistance of counsel, *State v. Rattana Keo Phuong*, 174 Wn. App. 494, 547, 299 P.3d 37 (2013), but it is only prejudicial if Ledesma can show that his sentence would have differed had counsel made the argument. *State v. Munoz-Rivera*, 190 Wn. App. 870, 887, 361 P.3d 182 (2015).

If separate offenses involve the same criminal conduct, they are counted as a single offense for purposes of calculating an offender score. RCW 9.94A.589(1)(a). Separate offenses constitute the same criminal conduct when three elements are present: "(1) same

21

criminal intent, (2) same time and place, and (3) same victim." *State v. Porter*, 133

Wn.2d 177, 181, 942 P.2d 974 (1997).  Unless all the elements are met, the offenses are

counted separately.  *State v. Chenoweth*, 185 Wn.2d 218, 220, 370 P.3d 6 (2016).  Where

the evidence supports either conclusion, the matter lies in the trial court's discretion.

*State v. Graciano*, 176 Wn.2d 531, 538, 295 P.3d 219 (2013).  The defendant bears the

burden of proving same criminal conduct.  *Id.* at 539.

Ledesma argues the two acts that occurred during the sleepover and the two acts

that occurred in the truck involve two, not four, instances of criminal conduct because his

intent did not change.  Multiple acts may have the same criminal intent if they constitute a

"continuing, uninterrupted sequence of conduct." *Porter*, 133 Wn.2d at 186.  When an

offender has time between the acts to "pause, reflect, and either cease his criminal activity

or proceed to commit a further criminal act," and chooses the latter, new criminal intent

has been formed to commit the second act.  *State v. Grantham*, 84 Wn. App. 854, 859,

932 P.2d 657 (1997).

We agree with Ledesma that the truck acts were the same criminal conduct.

Ledesma first put his hand on N.B.'s upper thigh and touched her vagina through her

pants.  When she moved his hand, he squeezed it and he then leaned over and touched her

breast.  These acts occurred within moments of one another and were a "continuing,

uninterrupted sequence." This scenario is like *Porter*, where the defendant made two back-to-back drug sales in the same place to the same undercover officer. 133 Wn.2d at 183.

However, we disagree with Ledesma that the sleepover incidents were the same criminal conduct. Ledesma relies on *Phuong*, 174 Wn. App. at 548, where the defendant dragged the victim from her car, up the stairs, and into his bedroom before attempting to rape her. Phuong was convicted of unlawful imprisonment and attempted rape. *Id.* at 501. At sentencing, counsel did not argue same criminal conduct, which was ineffective assistance because the court could have found Phuong's criminal purpose was the same for both the unlawful imprisonment and the attempted rape. *Id.* at 548.

*Phuong* is distinguishable. Notably, Ledesma first touched N.B. around 3:00 a.m. He then left the living room and came back, three hours later, to molest N.B. a second time. This is dissimilar from the unlawful imprisonment prior to the rape scenario that was a continuous sequence of events. It is more like *Grantham*, where the defendant raped the victim, kicked her, threatened her, ignored her requests to be brought home, then used new physical force to rape her again. 84 Wn. App. at 856. Ledesma had sufficient time—much more than Grantham had—to reflect on his first act before deciding to proceed with a second act. Thus, while we agree that Ledesma intended

23

sexual contact with N.B. for both acts, they were sufficiently distinct in time so that Ledesma had ample time between the incidents to pause and reflect.

In total, there were six instances of criminal conduct: (1) the jacket incident, (2) the truck incident, (3) the kitchen incident, (4) the first sleepover incident, (5) the second sleepover incident, and (6) the church incident. Because of how the State charged the three counts and argued them, it was not possible for the trial court (or us) to know which of the six instances of criminal conduct the jury's three convictions were based on. Out of the seven touchings, only the two truck touchings involved the same criminal conduct. The odds are therefore less than 50 percent that the jury erred by basing two of its three convictions on the two truck touchings. For this reason, we cannot conclude that the trial court would have found that two of the convictions were based on the same criminal conduct. Because Ledesma cannot establish he was prejudiced by his counsel's failure to raise the same criminal conduct argument at sentencing, we reject his ineffective assistance of counsel claim.

DR. KALLAS'S TESTIMONY

Ledesma argues the trial court erred by allowing Dr. Kallas to testify about what the social worker told her. Ledesma contends the testimony was inadmissible triple hearsay—N.B. to her mother, her mother to the social worker, and the social worker to

Dr. Kallas.  The State contends the testimony was admissible under a hearsay exception, ER 803(a)(4)'s statement for purposes of medical diagnosis or treatment.  Alternatively, the State argues that error, if any, is not reversible.  We agree with the second, alternative argument.

Nonconstitutional evidentiary error is reversible only if it is reasonably probable that the error materially affected the outcome of the proceeding.  *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001).  Here, the evidentiary error, if any, did not materially contribute to the jury's guilty verdicts.

N.B. testified at length about Ledesma's conduct and the State relied almost exclusively on her testimony to prove its case.  In contrast, Dr. Kallas testified the social worker told her "there was alleged fondling over clothing" that "occurred more than three days prior."  4 RP (Aug. 21-22, 2019) at 592.  This brief testimony was admitted by the State to explain why Dr. Kallas—rather than a SANE nurse—examined N.B.  Compared to N.B.'s extensive testimony, Dr. Kallas's testimony was generalized and brief.  Thus, the purported hearsay did not materially contribute to the jury's guilty verdicts.  We conclude that evidentiary error, if any, is not reversible.

*ER 403*

Ledesma argues for the first time on appeal that, even if Dr. Kallas's testimony

was admissible under the medical exception, it should have been excluded under ER 403

because it was unfairly prejudicial.[4]  The State argues this court should not address this

issue because it was not raised below.  We agree.

On appeal, a party may only assign error to a trial court's evidentiary ruling if they

objected on those grounds at trial.  *State v. Guloy*, 104 Wn.2d 412, 421, 705 P.2d 1182

(1985).  In other words, we will not reverse "where the trial court rejected the specific

ground upon which the defendant objected to the evidence and then, on appeal, the

defendant argues for reversal based on an evidentiary rule not raised at trial."  *State v.

Powell*, 166 Wn.2d 73, 82, 206 P.3d 321 (2009).

Ledesma did not raise an ER 403 objection to Dr. Kallas's testimony.  He instead

argued it was hearsay.  Because his objection did not sufficiently allow the trial judge to

---

[4]  ER 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

assess the proffered evidence under ER 403, he cannot now do so on appeal.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW (SAG)

Ledesma raises several additional arguments in his SAG. We address each issue in turn.

*SAG #1: Contradictions in testimony*

Ledesma contends that much of N.B.'s testimony was contradicted by her own and other witnesses' testimony. He lists dozens of instances where N.B.'s testimony changes slightly and points to facts and other testimony to undermine N.B.'s version of events. He also emphasizes that N.B.'s parents remained friends with him even after the allegations, inviting him on trips and not worrying about N.B. being near him—that, he claims, indicates they knew the abuse did not happen. He finally contends that N.B. made false accusations so that her family would move back to Florida.

While we can understand Ledesma's frustration, it is not the role of the appellate court to weigh evidence or engage in fact finding. *State v. Bennett*, 180 Wn. App. 484, 489, 322 P.3d 815 (2014). And we cannot review the jury's credibility determinations on appeal. *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003). The jury heard evidence from numerous witnesses, some of whom contradicted and undermined portions of N.B.'s testimony. The jury heard that N.B.'s parents stayed in touch with Ledesma

even after N.B. came forward about the abuse, and N.B. testified that she wished to live in Florida. The jury is free to believe or disbelieve witnesses and weigh the evidence before coming to a factual determination. Here, the jury found the State, through N.B. and other witnesses, proved beyond a reasonable doubt that Ledesma molested N.B. on three occasions. We cannot disturb a valid jury verdict on the grounds Ledesma raises.

*SAG #2: Ledesma prevented from testifying*

Ledesma next contends he requested to testify in his own defense, but his attorney advised against it and told him he did not need to because "everything would be just fine." SAG at 1.

Defendants have a constitutional right to testify on their own behalf. *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). This right is protected by both the federal and state constitutions. *Id.*; *State v. Robinson*, 138 Wn.2d 753, 758, 982 P.2d 590 (1999); U.S. CONST. amend. V; U.S. CONST. amend. VI; U.S. CONST. amend. XIV; WASH. CONST. art. I, § 22. This fundamental right "cannot be abrogated by defense counsel or by the court." *Robinson*, 138 Wn.2d at 758. Only a defendant can decide whether to exercise the right to testify, and a defendant's waiver of that right must be knowing, voluntary, and intelligent. *Id.* at 758-59.

A defendant may be entitled to an evidentiary hearing if counsel actually prevented the defendant from testifying. *State v. Thomas*, 128 Wn.2d 553, 557, 910 P.2d 475 (1996). However, an allegation that counsel advised against taking the stand, without "substantial factual evidence" is insufficient to warrant such a hearing. *Robinson*, 138 Wn.2d at 770; *see In re Pers. Restraint of Lord*, 123 Wn.2d 296, 316-17, 868 P.2d 835 (1994). "The defendant must 'allege specific facts' and must be able to 'demonstrate, from the record, that those 'specific factual allegations would be credible.'" *Robinson*, 138 Wn.2d at 760 (internal quotation marks omitted) (quoting *Passos-Paternina v. United States*, 12 F. Supp. 2d 231, 239 (D.P.R. 1998), *aff'd*, 201 F.3d 428 (1st Cir. 1999)).

Ledesma has not alleged specific facts nor pointed to any place in the record to show his counsel prevented him from testifying. Counsel told the court that he advised Ledesma of his absolute right to testify, as well as his absolute right not to testify. The court asked Ledesma whether this conversation occurred and Ledesma confirmed that it had. When the court asked what his decision was, Ledesma answered, "Not to testify." 5 RP (Aug. 26-27, 2019) at 680. In light of this record, Ledesma's bare assertion that counsel advised him against testifying does not warrant an evidentiary hearing on the issue.

SAG #3:  *Ineffective assistance of counsel*

Ledesma takes issue with several decisions made by his trial counsel.  He does not

present these arguments as ineffective assistance of counsel but instead lists them as

bullet points on the first page of his SAG.  While this court generally refuses to review

issues without argument and citation to authority, RAP 10.3(a)(5); *State v. Olson*, 126

Wn.2d 315, 320-21, 893 P.2d 629 (1995), we can dispose of these issues easily.

Ledesma first contends defense counsel "deliberately ignored" his request to

remove two venire jurors 15 and 22[5] from the pool.  SAG at 1.  We first note that

peremptory challenges fall within counsel's ambit; they are not designated as a

defendant's right.  *State v. Lawler*, 194 Wn. App. 275, 285, 374 P.3d 278 (2016).  But

because juror bias affects a defendant's constitutional right to a fair trial, *id.* at 281, we

briefly review the record.

Venire juror 15 worked for the Department of Corrections and is married to a

Tacoma police officer.  She understood the reasonable doubt standard and the importance

of keeping jury deliberations private.  Ledesma does not point to specific instances of bias

or develop any argument as to why venire juror 15 should not have been empaneled.

---

[5]  Venire juror 22 was excused for cause, so that issue is moot.

Ledesma next contends his counsel deliberately ignored his request to call a witness. In general, "the decision whether to call a particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 742, 101 P.3d 1 (2004). Tactical decisions such as these are left to defense counsel. *Grier*, 171 Wn.2d at 31.

Ledesma states that his desired witness, Mariana Barajas, brought N.B. from soccer games to Ledesma's home and knew N.B.'s relationship with her father. He otherwise does not explain how Ms. Barajas's testimony would have aided his defense. There are numerous reasons why counsel may not have called this witness and without more information, we cannot determine whether this decision was unreasonable. And of course, we cannot determine whether the absence of Ms. Barajas's testimony caused prejudice because we do not know what she would have testified about.

Without a developed argument or citation to the record, we cannot adequately address Ledesma's ineffective assistance of counsel claims. If material facts on this issue exist outside of the record, Ledesma must seek relief through a personal restraint petition. RAP 16.4; *State v. Alvarado*, 164 Wn.2d 556, 568-69, 192 P.3d 345 (2008).

*SAG #4: Ledesma's back problems*

Ledesma contends the judge was negligent in not providing information to the jury about his back problems.[6]  During trial, defense counsel addressed the court:

> My client wants you to understand that he was in apparently an accident a couple years ago and he's been moving around a lot in his seat and he's adjusting to get comfortable.  He has lower back issues.  We got him an extra pillow.  Hopefully that will take care of it.  He doesn't want you to think he's being disrespectful or anything.

3 RP (Aug. 20, 2019) at 450.  The court responded, "No problem.  Thanks for the explanation."  3 RP (Aug. 20, 2019) at 450.  The record does not contain any other references to Ledesma's back problems.  Again, without any specific argument or citations to the record, this court cannot review this issue.  *See* RAP 10.10(c) (We will not consider an argument made in a statement of additional grounds if it does not inform us of the nature and occurrence of the alleged error.).

Most of Ledesma's contentions involve issues this court is unable to review.  The remaining claims are undeveloped and lack merit.

---

[6] Ledesma's SAG reads: "I had requested that my attorney let the Judge and the jurors know of my back problems, (that situation came up in court about me, moving consistently), the judge was negligent to provide this information to the jurors."  SAG at 1.  It seems he meant to write that the judge was negligent in *not* providing this information to the jurors.

No. 37987-6-III
*State v. Ledesma*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:


_____        _____
Siddoway, A.C.J.                        Fearing, J.